**THE AGRESTA FIRM, P.C.**
THE BENZEL-BUSCH BUILDING
24 GRAND AVENUE
ENGLEWOOD, NJ 07631
(201) 399-6888
*Attorneys for Plaintiff*
*Agresta Acquisitions, LLC*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| Agresta Acquisitions, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>BTC Cloud Services, Ltd., Esteban Amador Soto Martinez, Gabriel Kleiman, David James Smith, Made Simple Group, Ltd., Lenta Business Centres, Ltd., Bromptons Solicitors, Azim Suleman, Enom, LLC, NameSilo, LLC, Cloudflare, Inc., ABC Companies 1-100, and JOHN DOES 1-100,<br><br>*Defendants.* | Civil Action No. 17-<br><br>*Document Filed Electronically*<br><br>**COMPLAINT** |

Plaintiff, Agresta Acquisitions, LLC is a Limited Liability Company with its headquarters at 24 Grand Avenue, Englewood, New Jersey ("Plaintiff") by way of Complaint against the defendants, BTC Cloud Services, Ltd., Esteban Amador Soto Martinez, Gabriel Kleiman, David James Smith, Made Simple Group, Ltd., Lenta Business Centres, Ltd., Bromptons Solicitors, Azim Suleman, Enom, LLC, NameSilo, LLC, Cloudflare, Inc., ABC Companies 1-100, and JOHN DOES 1-100 alleges as follows.

### SUMMARY OF CLAIMS

1.      This is a Complaint for, *inter alia*:

a. <u>First Count:</u>    Tortious Interference with an Ongoing and Prospective Business Advantage

b. <u>Second Count:</u>   False Designation of Origin (15 U.S.C. § 1125(a)))

c. <u>Third Count:</u>    False Advertising (15 U.S.C. § 1125(a)))

d. <u>Fourth Count:</u>   Common Law Fraud

e. <u>Fifth Count:</u>    Civil Conspiracy

f. <u>Sixth Count:</u>    Breach of Contract

g. <u>Seventh Count:</u>  Violation of the New Jersey Consumer Fraud Act N.J.S.A. 56:8-1(d)

h. <u>Eighth Count:</u>   Negligence

### THE PARTIES

2.     Plaintiff, Agresta Acquisitions, LLC ("AA") is a privately held Limited Liability Company with its principal place of business in the State of New Jersey at 24 Grand Avenue, Englewood, New Jersey.

3.     The defendant, BTC Cloud Services, Ltd. ("BTC") is corporation of the United Kingdom incorporated under the Companies Act 2006 as a private company limited by shares with its principal address at 46-48 Smithfield, Tower Bridge Business Centre Suite 313, London, United Kingdom, E1W 1AW a space owned and/or leased by the defendant Lenta Business Centres, Ltd.

4.     The defendant, Esteban Amador Soto Martinez ("Martinez") is a citizen of Mexico and upon information and belief is a resident of the United Kingdom and is and was a principal of BTC Cloud Services, Ltd.

2

5.     The defendant, Gabriel Kleiman ("Kleiman") born May 7, 1983, is a citizen of the United Kingdom and upon information and belief is a resident of the United Kingdom and is and was a principal of BTC Cloud Services, Ltd.

6.     The defendant David James Smith ("Smith") is a citizen of the United Kingdom and upon information and belief is a resident of the United Kingdom and is and was a principal of BTC Cloud Services, Ltd.

7.     Smith, Kleiman and Martinez are collectively referred to herein as the "Principals".

8.     The defendant Made Simple Group, Ltd. ("Made") is a private limited company of the United Kingdom with its principal address at 20-22 Wenlock Road, London, N1 7GU.

9.     The defendant Lenta Business Centres, Ltd. ("Lenta") is a private limited company with an address at Cp House, Otterspool Way, Watford, Hertfordshire, WD25 8HR.

10.     The defendant Bromptons Solicitors, Ltd. ("Bromptons") are licensed solicitors in the United Kingdom with an address at 219 Kensington High Street, London, United Kingdom W8 6BD.

11.     The defendant Azim Suleman ("Suleman") is a licensed solicitor and the SRA-approved manager - Sole Practitioner, Compliance Officer for Legal Practice and Compliance Officer for Finance and Administration at Bromptons with an address at 219 Kensington High Street, London, United Kingdom W8 6BD.

12.     ENOM, LLC. ("ENOM") is a Delaware Limited Liability Company with its registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware

19801.

13.     NameSilo, LLC ("NameSilo") is an Arizona Limited Liability Company with its domestic address at 1300 E Missouri Ave,  Suite A-110, Phoenix, Arizona.

14.     Cloudflare, Inc. ("Cloudflare") is a Delaware Limited Liability Company with its registered agent at 9 E. Lockerman Street, Suite 311, Dover, Delaware 19901.

15.     ABC Companies 1-100 & John Does 1-100, are fictitious persons, they are agents, servants and/or employees engaged by the defendants with the requisite legal authority necessary to bind, obligate and/or subject the defendants to legal recourse by the plaintiffs based upon their actions. The true names or capacities, whether individual, corporate, officer, representative, or otherwise of ABC Companies 1-100 & John Does 1-100 are not known to plaintiffs who consequently sue such defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to state the true names and capacities of the fictitiously named defendants when they have been ascertained. Plaintiffs are informed and believe and therefore aver, that each of the ABC Companies 1-100 & John Doe, defendants are liable to plaintiffs for damages as hereinafter set forth.  Each ABC Company is as company related to or part of the defendant companies, and each John Doe defendant is an officer, director, managing agent, partner, employee and/or agent of the other defendants, which give rise to the liability and damages as set forth herein. Plaintiffs are informed and believe and therefore aver that the John Doe defendants, and each of them, were the agents, employees, servants and/or representatives of the named defendants and were, at all times relevant herein, acting within the purpose and scope of such agency employment or contract.

16.     Plaintiffs are informed and believe, and thereon allege, that each of the

4

fictitiously named defendants is responsible in some manner for the actions and occurrences herein alleged, and that plaintiffs' damages as herein alleged were proximately caused by their acts. Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned the ABC Companies and JOHN DOE defendants acted in concert with, and were/was the agent, employee, contractor, partner, servant, and/or representative of, each of the other defendants, and in doing the acts hereinafter alleged was acting in concert and within the course and scope of its/their authority as an agent, servant, employee and/or representative, with the permission and consent of the other defendants.

## JURISDICTION

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims *inter alia* under the Magnusson-Moss Fair Trade Commission Improvement Act 15 *U.S.C.A.* 2301 (3).

18.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, inasmuch as Plaintiffs and Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.00.

19.     Venue in the United States District Court for the District of New Jersey is proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff Agresta Acquisitions, LLC resides in this District and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## BITCOIN BACKGROUND

20.     Bitcoin is a cryptocurrency and worldwide payment system.

5

21.     It is the first decentralized digital currency – the system works without a central bank or single administrator.

22.     The network is peer-to-peer and transactions take place between users directly through the use of cryptography, without an intermediary.

23.     These transactions are verified by network nodes and recorded in an immutable public distributed ledger called a blockchain.

24.     Bitcoin was invented by an unknown person or group of people under the name Satoshi Nakamoto and released as open-source software in 2009.

25.     Bitcoins are created as a reward for a process known as mining. They can be exchanged for other currencies, products, and services.

26.     As of February 2015, over 100,000 merchants and vendors accepted bitcoin as payment.

27.     Research produced by Cambridge University estimates that in 2017, there are 2.9 to 5.8 million unique users using a cryptocurrency wallet, most of them using bitcoin.

28.     As of 8:30 PM on December 7, 2017 the price of Bitcoin in United States Dollars as convertible by one of the largest Bitcoin exchanges known as coinbase.com was Seventeen Thousand Six Hundred Thirty Eight ($17,638.12) Dollars and Twelve Cents per Bitcoin (the "Strike Price").

29.     Mining is a record-keeping service done through the use of computer processing power.

6

30.     Miners keep the blockchain consistent, complete, and unalterable by repeatedly verifying and collecting newly broadcast transactions into a new group of transactions called a block.

31.     Each block contains a cryptographic hash of the previous block, using the SHA-256 hashing algorithm, which links it to the previous block, thus giving the blockchain its name. Miners may aggregate mining resources in a mining pool.

32.     To be accepted by the rest of the network, a new block must contain a so-called proof-of-work.

33.     The proof-of-work requires miners to find a number called a nonce, such that when the block content is hashed along with the nonce, the result is numerically smaller than the network's difficulty target.

34.     This proof is easy for any node in the network to verify, but extremely time-consuming to generate, as for a secure cryptographic hash, miners must try many different nonce values (usually the sequence of tested values is 0, 1, 2, 3, ...) before meeting the difficulty target.

35.     Defendant BTC operated such a pool and sold mining contracts to customers over the Internet offering a portion of its mining pool designated in GHash/s (Gigahash per Second) in exchange for a payment of Bitcoin. (the "BTC Contracts")

36.     One GHash/s is one billion hashes per second.

37.     A hash algorithm turns an arbitrarily-large amount of data into a fixed-length hash. The same hash will always result from the same data, but modifying the data by even

one bit will completely change the hash. Like all computer data, hashes are large numbers, and are usually written as hexadecimal.

38.     BitCoin uses the SHA-256 hash algorithm to generate verifiably "random" numbers in a way that requires a predictable amount of CPU effort. Generating a SHA-256 hash with a value less than the current target solves a block and wins you some coins. The proof-of-work system, alongside the chaining of blocks, makes modifications of the blockchain extremely hard, as an attacker must modify all subsequent blocks in order for the modifications of one block to be accepted.

39.     As new blocks are mined all the time, the difficulty of modifying a block increases as time passes and the number of subsequent blocks (also called confirmations of the given block) increases.

## HISTORY OF THE DEFENDANT BTC

40.     On or about March 12, 2014, Martinez contracted with Made to form the entity known as BTC Cloud Services, Ltd. which Made performed on Martinez' behalf.

41.     BTC Cloud Services, Ltd. held itself out as a legitimate business engaged in the business of bitcoin mining.

42.     Upon information and belief, Esteban Amador Soto Martinez is an alternate name employed by individual(s) for the purpose of perpetrating cyber fraud using the currency known as Bitcoin among others.

43.     Upon information and belief Made took little or no steps to verify the names or identities of the owners of BTC before forming the company despite certifying under oath to

8

the Registrar of Companies for England and Wales that it had authenticated the identity of Martinez.

44.     As part of Made's contract with Martinez to form BTC, Made agreed to provide an initial address for BTC at 145-157 St. John Street, London, England EC1V 4PY.

45.     The certificate of incorporation filed by Made identifies that it "Authenticated Electronically" the signature of the subscriber Martinez despite the fact that Made performed no such authentication.

46.     On March 12, 2014 the Registrar of Companies for England and Wales recorded the Certificate of Incorporation identifying BTC as company number 8935510.  A true copy of the Certificate of Incorporation identifying Made as the incorporator and authenticating Martinez' signatures is attached hereto as Exhibit "A"

47.     On April 20, 2014, Martinez was replaced with Smith as the named director and secretary of the company. A true copy of the CH01 and CH03 forms declaring the changes and authenticating the filers are attached hereto as Exhibit "B"

48.     Upon information and belief, BTC replaced Martinez with Smith because on January 13, 2014, a Bitcoin Forum participant operating under the handle "grimlock" reported that Martinez was associated with a website known as "BitcoinCloudHashing.com" and that "I just wanted to let you know of a scam web site that is being advertised on Google (search term "bitcoin cloud mining").  The web site is www.bitcoincloudhashing.com.  I chatted with someone on the site, using their Zopim chat program on the homepage, and they claimed to be Equinix, Inc (www.equinix.com).  So I called Equinix, Inc (located at the same physical address that www.bitcoincloudhashing.com claims to be at on their web site, which is One

9

Lagoon Drive, 4th Floor, Redwood City, CA 94065) at +1-650-598-6000.  I got to talk finally to a sales person, and she then did some leg work to find out that this site has nothing to do with Equinix.  She said the matter had been turned over to legal and that many other people had asked today about this site."  See Bitcoin Talk, https://bitcointalk.org/index.php?topic=414314.0, accessed December 8, 2017.

49.    Upon information and belief the Companies House could not verify Smith's identity and on May 16, 2014, Martinez replaced Smith again as the named director of BTC so that Martinez could update the address of BTC.  A true copy of the CH01 form declaring the changes and authenticating the filers is attached hereto as Exhibit "C".

50.    On May 20, 2014, BTC filed a Change of Registered Office Address with the Companies House, changing their address to 219 Kensington High Street, London, England, W8 6BD, the office of Bromptons Solicitors.  A true copy of the AD01 form declaring the changes and authenticating the filers is attached hereto as Exhibit "D".

51.    Bromptons Solicitors counseled BTC and the Directors and provided registered agent services for BTC beginning on May 20, 2014.

52.    Bromptons Solicitors is lead by principal solicitor, defendant Azim Suleman ("Suleman").  Pursuant to Bromptons' website "a highly experienced commercial and property lawyer and a savvy and tenacious litigator, who has been in private practice for over 30 years. Having acquired a BA (Hons.) in Business Law in the City of London, Azim attended the Inns of Court School of Law and was called to the Bar at the Honourable Society of Gray's Inn in July 1982."  See http://www.bromptons.net/lawyers-solicitors-london-uk/

10

53.     The Law Society of England and Wales confirms that Mr. Suleman serves in the roles of SRA-approved manager - Sole Practitioner, Compliance Officer for Legal Practice, Compliance Officer for Finance and Administration for Bromptons Solicitors.

54.     Bromptons' website also tout's Mr. Suleman's expertise in representing his "overseas client base" stating that "[Suleman] initially practiced as a Barrister from 1982 before being admitted as a Solicitor in 1992. Azim helped found his first legal practice with two colleagues in 1988 which is still going strong in London. Suleman established Bromptons Solicitors in 1999 to provide expert, cost-effective and highly personal service to his UK and overseas client base."

55.     Bromptons Solicitors took little to no steps to adequately investigate the legality or legitimacy of BTC's business nor to verity or authenticate the identity of its owners or alternatively was aware of BTC's business and aided and abetted BTC in avoiding detection and perpetrating an ongoing fraud.

56.     In his role as SRA Approved Manager and Compliance Officer, Suleman had an obligation to verify the authenticity and perform basic due diligence as to BTC's business to prevent the ongoing fraud.

57.     On May 29, 2014, BTC filed another Change of Registered Office Address with the Companies House changing its address to 46-48 East Smithfield, Tower Bridge Business Centre, Suite 313, London, United Kingdom, an address leased by defendant Lenta.  A true copy of the AD01 form declaring the changes and authenticating the filers is attached hereto as Exhibit "E".

11

58.     Lenta took no steps to verify the information or identity of BTC or the Directors and provided an address for BTC in London.

59.     On June 9, 2014, BTC filed another Change of Secretary form with the Companies House terminating Martinez as secretary, declaring defendant Gabriel Kleiman the replacement secretary for Martinez and allotting 200 new shares.  A true copy of the CH03, TM02 and SH01 forms are attached hereto as Exhibit "F".

60.     On July 5, 2014, BTC filed a notice of Appointment of Director of defendant Gabriel Kleiman with the UK Companies House, identifying him as a British national, working as a merchant and that his date of birth was July 5, 1983.  Simultaneously, BTC filed notices terminating Martinez as Director and Secretary.  A true copy of the TM01, TM02 and AP01 forms are attached hereto as Exhibit "G."

61.     On March 26, 2015, BTC filed its annual return form identifying Gabriel Kleiman as the sole director of the company and Martinez as the sole shareholder.  The form was authenticated by the companies house.  A true copy of the AR01 form is attached hereto as Exhibit "H."

62.     On February 9, 2016, the Companies House announced that the Registrar of Companies would strike BTC Cloud Services, Ltd. from the companies register and dissolve the company pursuant to the Companies Act 2006 (Section 1000(3)).  A true copy of correspondence from the Companies House to the Directors of BTC Cloud Services, Ltd. dated February 9, 2016 is attached hereto as Exhibit "I."

63.     The Companies Act 2006 (Section 1000(3)) provides in relevant part that "If the registrar receives an answer to the effect that the company is not carrying on business or in

operation, or does not within one month after sending the second letter receive any answer the registrar may publish in the Gazette, and send to the company by post, a notice that at the expiration of three months from the date of the notice the name of the company mentioned in it will, unless cause is shown to the contrary, be struck off the register and the company will be dissolved.

64.     On April 26, 2016 the Companies House dissolved BTC Cloud Services, Ltd. A true copy of the notice of dissolution is attached hereto as Exhibit "J."

<u>BTC's BUSINESS</u>

65.     BTC held itself out on the internet as a provider of cloud-based Bitcoin mining services.

66.     The Wayback Machine is a digital archive of the World Wide Web and other information on the Internet created by the Internet Archive, a nonprofit organization, based in San Francisco, California, United States.

67.     Since 1996, the Wayback Machine ("Wayback") has been archiving cached pages of websites onto its large cluster of Linux nodes. It revisits sites on occasion (see technical details below) and archives a new version. Sites can also be captured on the fly by visitors who enter the site's URL into a search box. The intent is to capture and archive content that otherwise would be lost whenever a site is changed or closed down. The overall vision of the machine's creators is to archive the entire Internet.

68.     According    to    Wayback    the    website    maintained    by    BTC bitcoincloudservices.com was saved 71 times between August 12, 2014 and December 2, 2017.

69.     At the first capture of BTC's website, BitcoinCloudServices.com the front page is replete with information about BTC's operations, making the following averments regarding BTC's operations:

    a.  We offer Bitcoin Cloud Mining Contracts the right way: transparent, convenient and above all cost-effective.

    b.  We offer you an opportunity to start mining Bitcoin and avoid all the usual problems you can face when buying mining equipment, like the usual delays in delivery, breakage losses, the need for a sufficient power supply or cooling devices.

    c.  Easy Bitcoin Mining - We combine cutting-edge hardware with simple and easy-to-understand cloud mining contracts to bring you the most advanced cloud based mining solution available on the market.

    d.  Daily Payouts - All contracts are activated everyday and everyday is Payout Day.

    e.  Great Service and Support - On-site technicians ensure that individual elements of the cloud mining infrastructure are continuously monitored, and serviced when necessary. We offer constant paybacks and professional support.

    f.  Bitcoin mining has never been so easy!

    g.  Bitcoin Cloud Services works with the best hardware providers and software engineers to ensure quality hardware support along with great development capability.

h.  Cloud mining or cloud hashing is a brand new concept, which allows users to form groups (pools), where their joint efforts are rewarded with greater income, compared to solo mining. All Bitcoin mining is done in the cloud, without any offline hassle, such as electricity, hosting issues, or installation and upkeep trouble. Thus, everybody can earn extra revenue with little to no risk.

70.     BTC advertised its overall initial hashrate as 405 TH/s 405,000 (GHash/s) and identified the payout address it uses as 1BTCPayb5AdF8fSsR7oews2PpuVpRtamk6 (the "Payout Address").

71.     Because of how the blockchain functions, it is possible to identify the total number of transactions paid out of and received from a Bitcoin address and to what other addresses they were paid.

72.     A search of the Payout Address on the website blockchain.info demonstrates that the address participated in 1460 transactions between June 3, 2014 and September 10, 2017 having received a total of 14,473.82 bitcoins, which would be worth approximately Two Hundred Fifty Five Million Two Hundred Ninety Thousand Nine Hundred Seventy Four ($255,290,974.00) Dollars at the Strike Price.

73.     Among the most recent inputs to the Payout Address are payments from an identified Bitcoin address at BTC-Multiplier.net, which has likewise been exposed as a scam on other Bitcoin forums.  BTC-Multiplier's advertising mimic's the defendant BTC's.

74.     BTC-Multiplier's website advertising touts:

15

a.   How Is This Possible?  - We are a small group of investors, programers (sic) and brokers which have dedicated their time to research and development.

b.   Why would we share our tools? -- We are not actually providing you access to our tools but we do provide you the benefits of them.   Having more BTC from investors like you, will help us to get even higher returns on investments. HOW? check our FAQ .

c.   How can you start? --All you have to do is decide how much BTC you want to invest and how long you want wait for the return on investment.   Just go to the Invest Now tab and transfer some Bitcoins to the address provided. Please note that we do not accept investments below 0.01 Bitcoins..

75.   Upon information and belief BTC-Multiplier.net is an alter-ego of the defendant BTC's original scheme BitcoinCloudServices.com.

## AA's BUSINESS WITH BTC

76.   On April 14, 2015, AA opened an account with BTC to invest in Bitcoin Cloud Mining contracts offered by BTC.

77.   AA conducted basic due diligence and relied upon the Companies House records informed by Bromptons, the Domain Name history provided by ENOM, the address leased by Lenta and the marketing and advertising on BTC's website to select BTC as its Cloud Mining Contract service provider.

16

78.     On April 14, 2015, AA purchased its first Bitcoin Cloud Mining contract from BTC, purchasing 10,000 GHash/s for the price of 14.00 bitcoins, which approximates to $246,933.68 at the Strike Price (the "First Contract").

79.     On April 14, 2015, BTC confirmed by email the purchase of a 12-month mining contract to begin on April 14, 2015 to payout at a hash rate of 10,000 GH/s.

80.     On April 16, 2015, BTC made its first payout to AA's Bitcoin address in the amount of .17029191 Bitcoin.

81.     AA began receiving semi-regular daily payouts of Bitcoin beginning on April 16, 2015.

82.     On April 19, 2015, BTC provided and email linking to a tradeblock mining calculator for use calculating the payouts expected based upon the hash rate.  BTC marketed that they have mined over 8500 bitcoin for customers and that amount to more than $1,800,000 USD at the time.  At the Strike Price this would have been approximately One Hundred Fourty Nine Million Nine Hundred Twenty Four Thousand Twenty ($149,924,020.00) Dollars worth of Bitcoin.

83.     On April 29, 2015, AA purchased its second Bitcoin Cloud Mining contract from BTC, purchasing 10,000 GHash/s for the price of 14.00 bitcoins, which approximates to $246,933.68 at the Strike Price (the "Second Contract").

84.     On April 29, 2015, BTC confirmed by email the purchase of a 12-month mining contract to begin on April 29, 2015 to payout at a hash rate of 10,000 GH/s.

85.     The First Contract and Second Contracts were performing at a rate of approximately .1088957 Bitcoin per day and should have jointly generated approximately 80

Bitcoin in one-year of service from April 14, 2015 through April 14, 2016 and April 29, 2015 through April 29, 2016 respectively based upon BTC's advertisements and the number of GHash/s purchased.  This would approximate to One Million Four Hundred Eleven Thousand Fourty Nine Dollars ($1,411,049.60) and Sixty Cents.

86.     On May 15, 2015, AA purchased its third Bitcoin Cloud Mining contract from BTC, purchasing 11,420 GHash/s for the price of 15.99 bitcoins, which approximates to $282,033.54 at the Strike Price (the "Third Contract").

87.     On May 15, 2015, BTC confirmed by email the purchase of a 12-month mining contract to begin on May 15, 2015 to payout at a hash rate of 11,430 GH/s.

88.     The Third Contract was performing slightly better than the first two yielding approximately .12393961 Bitcoin per day and should have generated an additional 45 Bitcoin in one-year of service from May 15, 2015 through May 15, 2016, which approximates to Seven Hundred Ninety Three Thousand Seven Hundred Fifteen ($793,715.40) Dollars and Fourty Cents.

89.     AA's entire investment in Bitcoin mining contracts with BTC was 43.99 Bitcoins or approximately Seven Hundred Seventy Five Thousand Nine Hundred Dollars ($774,900.90) and Ninety Cents.

**BTC CEASES OPERATIONS**

90.     On or about June 7, 2015 BTC ceased making payouts of Bitcoin and AA complained to BTC by way of email to which BTC responded that "Thank you for contacting Bitcoin Cloud Service's Premium Support.  Your request (7007) has been received and is being reviewed by our support staff. So we don't leave you wondering, we aim to respond to standard

18

support queries within 12- 24 hours. Outside of business hours we aim to respond to all email support requests within 1 business day.  Sometimes we go a little over and usually we respond a lot faster - so thanks for your patience :)."

91.     A true copy of this email and all emails with BTC confirming purchases of Bitcoin mining contracts is attached hereto as Exhibit "K."

92.     BTC never responded again to AA's request.

93.     A schedule detailing BTC's payout of Bitcoin is attached hereto as Exhibit "L."

94.     AA's anticipated return was Two Million Two Hundred Four Thousand Seven Hundred Sixty Five ($2,204,765.00) Dollars plus repayment of its principal.

95.     On June 5, 2015, Bitcoin Magazine reported that Bitcoin Cloud Services was a possible          Ponzi          scheme.          See          Bitcoin          Magazine, https://bitcoinmagazine.com/articles/exclusive-possible-500000-bitcoin-cloud-mining-ponzi-scheme-uncovered-1433546738/ accessed December 8, 2017.

96.     Further analysis of the BTC website revealed that the images of BTC's mining equipment appeared to have been doctored to look real.

97.     By watching Bitcoin Cloud Services' payout address, Bitcoin Magazine stated that it is possible to "estimate the number of customers receiving payouts, along with [BTC]'s profits and losses. [BTC] seems to have started to operate at a loss near the end of April."

98.     BTC under the control of its directors never acutally owned any Bitcoin mining equipment or ever mined a single Bitcoin.

99.     Instead BTC operated as a Ponzi scheme, whereby it repaid to its customers their own Bitcoin in small amounts to make it appear plausible that they were actually mining Bitcoin.

100.     Domain name providers such as the defendants ENOM and NameSilo provide registration services to register domain names and did so for BTC in connection with the BitcoinCloudHashing.com and BitcoinCloudServices.com domain names respectively.

101.     Defendant ENOM and NameSilo are each ICANN accredited registrars.

102.     ICANN is the Internet Corporation for Assigned Names and Numbers which is a nonprofit organization responsible for coordinating the maintenance and procedures of several databases related to the namespaces of the Internet, ensuring the network's stable and secure operation

103.     ICANN requires each of their registrars maintain certain policies and proecdures with respect to domain name registrations.

104.     ENOM and NameSilo did not maintain reasonable policies in compliance with ICANN directives.

105.     ENOM and NameSilo each advertise that they are ICANN accredited domain name registrars.

106.     ENOM and NameSilo failed to comply with the ICANN Registrar/Registered Name Holder Agreements that they entered into with ICANN that provides:

        a.  Registrars are required to enter into electronic or paper registration agreements with all Registered Name Holders. According to the RAA, the

Registrar/Registered Name Holder Agreement must include – at minimum – the following items (as stated at Sections 3.7.7.1 – 12 of the RAA):

b. The Registered Name Holder must provide "accurate and reliable contact details" *and* must "promptly correct and update them" during the registration term. The details required are stated in Section 3.7.7.1.: "the full name, postal address, e-mail address, voice telephone number, and fax number if available of the Registered Name Holder; name of authorized person for contact purposes in the case of a Registered Name Holder that is an organization, association, or corporation; and the data elements listed in Subsections 3.3.1.2, 3.3.1.7 and 3.3.1.8."

c. If a Registered Name Holder intentionally provides inaccurate or unreliable information, intentionally fails to promptly update the information, or fails to respond over fifteen (15) days to Registrar inquiries about the accuracy of the contact details, the Registered Name Holder will be in material breach of the agreement and the registration may be cancelled.

d. Whoever is listed as the Registered Name Holder must provide full contact information, and is the Registered Name Holder of record. Sometimes a Registered Name Holder may register a domain name and then allow another person to use the domain name (such as a website designer registering a domain name for a client). If this happens, and the person actually using the name did not enter into the Registrar/Registered Name Holder Agreement (referred to as a "third party" in the RAA), the Registered

21

Name Holder could be accountable for wrongful use of the domain name by the third party. This will happen if the Registered Name Holder is provided with "reasonable evidence of actionable harm" from the third party's use of the domain name. In that situation the Registered Name Holder will "accept liability for harm caused by wrongful use of the Registered Name," unless the Registered Name Holder discloses the user's identity and current contact information.

107.    ENOM and NameSilo each sold the respective BitcoinCloudServices.com and BitcoinCloudHashing.com in violation of their Registrar/Registered Name Holder Agreements with ICANN and permitted the use of a fake name in the registration of a domain name in violation of ICANN policies.

108.    ICANN's agreement provides in section 3.7.8 that the "Registrar shall abide by any specifications or policies established according to Section 4 requiring reasonable and commercially practicable (a) verification, at the time of registration, of contact information associated with a Registered Name sponsored by Registrar or (b) periodic re-verification of such information. Registrar shall, upon notification by any person of an inaccuracy in the contact information associated with a Registered Name sponsored by Registrar, take reasonable steps to investigate that claimed inaccuracy. In the event Registrar learns of inaccurate contact information associated with a Registered Name it sponsors, it shall take reasonable steps to correct that inaccuracy."

109.    The ICANN agreement provides in section 3.7.7.12 that "The Registered Name Holder shall indemnify and hold harmless the Registry Operator and its directors, officers,

22

employees, and agents from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable legal fees and expenses) arising out of or related to the Registered Name Holder's domain name registration"

110.    The ICANN agreement does not in any way limit ENOM and NameSilo's third party liability for failure to abide ICANN policies when advertising compliance therewith on their respective websites.

111.    ENOM and NameSilo acted unreasonably in failing to maintain records as reasonable registrars in accordance with industry standards set by ICANN.

112.    CloudFlare is not an ICANN registrar, however the practice of provider of hosting services is to demand their clients provide reasonable account information including verified contact information.

113.    CloudFlare failed to obtain verified contact information from BTS in derivation from industry standards for hosting services providers.

114.    BTC's false advertising and operation of the Ponzi scheme caused a complete collapse of AA's Bitcoin trading business and losses of AA's anticipated return of Two Million Two Hundred Four Thousand Seven Hundred Sixty Five ($2,204,765.00) Dollars plus repayment of its principal in the amount of Seven Hundred Seventy Five Thousand Nine Hundred Dollars ($774,900.90) and Ninety Cents.

115.    As a result of this loss, AA was also unable to purchase subsequent mining contracts for the 2016-2017 contract year.  AA's reinvestment of the 125 new Bitcoin that BTC would have, but failed to generate, had it been a legitimate Bitcoin mining operation should have performed at a multiple of 2.8125 x the initial investment and yielded a return of 351.56

23

Bitcoin or an additional Six Million Two Hundred Thousand Nine Hundred One ($6,200,901.56) Dollars and Fifty-Six Cents.

## First Count

### Tortious Interference with an Ongoing and Prospective Business Advantage

116.    Plaintiff refers to and by this reference incorporates all preceding paragraphs as though more fully set forth herein at length.

117.    This claim is brought pursuant to New Jersey common law.

118.    The defendants each acted individually to interfere in the operations of the plaintiff by such conduct, inducing AA to enter into agreements with BTC that the defendants knew or should have known could never have been fulfilled.

119.    The conduct of BTC, the other defendants and their cohorts is malicious, oppressive, and undertaken with a tortious disregard for the rights of Plaintiff.

120.    AA had a reasonable expectation of an economic advantage from its valuable contracts with BTC, and relies upon laws that prevent malicious and intentional actions by vendor organizations that fail to verify the legitimacy of their clients businesses which they promote, represent or otherwise make appear more legitimate.

121.    The Defendants' collective actions were committed with malice, willfulness and the intent to interfere with AA's expectation to do business with persons seeking to do business with Meadowlands, without reasonable and lawful justification or excuse.

122.    But for the Defendants' collective actions, AA had more than a reasonable expectation that their investment in a Bitcoin cloud mining contract would have produced a reasonable return.

123.   As a result of the Defendants' collective actions, AA has suffered injury, including irreparable injury, and damages, including lost profits, and other damages to be established at trial.

124.   Accordingly, AA is entitled to punitive damages according to proofs submitted at the time of trial.

125.   Each of the Defendants' actions are wrongful and without justification or excuse.

126.   As a proximate cause of the conduct aforesaid actions, AA suffered and continues to suffer economic damages.

## Second Count

### False Designation of Origin (15 U.S.C. § 1125(a)))

127.   Plaintiff refers to and by this reference incorporates all preceding paragraphs as though more fully set forth herein at length.

128.   AA relied on the averments contained both on BTC's website and in the papers filed with the Companies House by the co-defendants as well as the location of BTC's offices in selecting BTC as its Bitcoin mining services provider.

129.   AA relied upon BTC that it would actually be using AA's investment for the mining of Bitcoin.

130.   AA relied upon the Directors for the premise that it would be an effectively managed company and legitimate business in selecting BTC as its Bitcoin mining services provider.

25

131.   AA relied upon Made's averments that it had authenticated the signatures of the owners and that the documents filed with the Companies House were legitimate in selecting BTC as its Bitcoin mining services provider.

132.   AA relied upon Bromptons address as the registered solicitors of BTC in the documents filed with the Companies House in selecting BTC as its Bitcoin mining services provider.

133.   AA relied upon ENOM, NameSilo and Cloudflare as BTC service providers as having verified the legitimacy and very existence of BTC's business and providers of BTC's servers and equipment including equipment necessary for the distribution of daily payouts of mined bitcoin.

134.   Each of these false labels constitute the use of false or misleading designations of origin and/or the making of false or misleading representations of fact in violation of 15 U.S.C. § 1125(a), in that, among other things, such use is likely to cause confusion, deception and mistake among the consuming public and trade as to the source, approval or sponsorship of the mining contracts.

135.   As a proximate cause of the conduct aforesaid actions, AA suffered and continues to suffer economic damages.

## Third Count

### False Advertising (15 U.S.C. § 1125(a)))

136.   Plaintiff refers to and by this reference incorporates all preceding paragraphs as though more fully set forth herein at length.

26

137.   BTC and each of the defendants has made use of false advertising and/or false or misleading representations of fact which are likely to cause confusion and mistake among the consuming public that BTC was a legitimate mining operation in violation of 15 U.S.C. § 1125(a) and that the officers and directors were known to the other defendants and their signatures and identities were verified.

138.   As a proximate cause of the conduct aforesaid actions, AA suffered and continues to suffer economic damages.

## Fourth Count

### Common Law Fraud

139.   Plaintiff refers to and by this reference incorporates all preceding paragraphs as though more fully set forth herein at length.

140.   This claim is brought pursuant to New Jersey common law.

141.   BTC falsely represented to AA that it was selling legitimate Bitcoin mining contracts and that it owned bitcoin mining operations for which it was licensing time and hours.

142.   AA relied on the averments contained both on BTC's website and in the papers filed with the Companies House by the co-defendants as well as the location of BTC's offices in selecting BTC as its Bitcoin mining services provider.

143.   AA relied upon BTC that it would actually be using AA's investment for the mining of Bitcoin.

144.   AA relied upon the Directors for the premise that it would be an effectively managed company and legitimate business in selecting BTC as its Bitcoin mining services provider.

27

145.    AA relied upon Made's averments that it had authenticated the signatures of the owners and that the documents filed with the Companies House were legitimate in selecting BTC as its Bitcoin mining services provider.

146.    Made's business practice is to willfully operate its business in a way to not require authentication of signatures in violation of UK law and because it knowingly faciliatates the perpetration of fraudulent activity through companies that it forms such as BTC.

147.    AA relied upon Bromptons address as the registered solicitors of BTC in the documents filed with the Companies House in selecting BTC as its Bitcoin mining services provider.

148.    Bromptons represented BTC and provided registered agent services at its office address and AA relied upon Bromptons' actions in furtherance of BTC's fraudulent conduct.

149.    AA relied upon ENOM, NameSilo and Cloudflare as BTC service providers as having verified the legitimacy and very existence of BTC's business and providers of BTC's servers and equipment including equipment necessary for the distribution of daily payouts of mined bitcoin.

150.    ENOM, NameSilo and Cloudflares' business practices are to willfully operate their businesses in a way to not require authentication of individuals because they knowingly facilitate the perpetration of fraudulent activity through companies they provide IT services to.

151.    Lenta's business practice is to willfully operate its business in a way to not

28

require verification of its tenants and to permit its tenants to hold themselves out as having office space in Lenta's property.

152.    Lenta knowingly permits criminal enterprises to lease space in its premises and has been previously accused of such activity.

153.    For the purpose of executing the scheme or artifice to AA the defendants transmitted and/or caused to be transmitted false documents by means of wire communications in interstate commerce in violation, *inter alia*, of 18 *U.S.C.* § 1343, as set forth in 18 *U.S.C.* § 1961(1)(B).

154.    As a proximate cause of the conduct aforesaid actions, AA suffered and continues to suffer economic damages.

**Fifth Count**

**Civil Conspiracy**

155.    Plaintiffs refer to and by this reference incorporate all preceding paragraphs as though more fully set forth herein at length.

156.    As described in herein BTC, the other defendants and their cohorts, conspired to tortuously interfere with AA's business and to facilitate the perpetration of a fraud on unwitting customers of BTC.

157.    Both BTC and each of the other defendants have impermissibly benefited from this scheme to the detriment of AA.

158.    As a proximate cause of the conduct aforesaid actions, AA suffered and continues to suffer economic damages.

**Sixth Count**

29

**Breach of Contract**

159.    BTC and AA entered into three contracts whereby BTC would provide AA

with Bitcoin mining services identified herein as the First Contract, the Second Contract and

the Third Contract.

160.    BTC utterly failed to deliver the advertised and contracted Bitcoin mining

services breaching its obligations to AA and causing financial harm.

**Seventh Count**

**Violation of the New Jersey Consumer Fraud Act *N.J.S.A.* 56:8-1(d)**

161.    Plaintiff hereby incorporates all facts and allegations set forth in this

Complaint by reference as if fully set forth at length here.

162.    Defendants are each a "Person" as defined by N.J.S.A. 56:8-1(d).

163.    AA is a "Person" as defined by N.J.S.A. 56:8-1(d).

164.    Defendants' actions surrounding the sale of fake Bitcoin mining contracts

were unconscionable.

165.    Defendant's actions surrounding the sale of the Bitcoin contracts constitutes

an unconscionable commercial practice, deception, fraud, false pretense, false promise,

and/or misrepresentation. Defendant and its agents acted affirmatively in such a manner as to

be an unlawful commercial practice.

166.    Defendant acted knowingly with the intent to cause plaintiff's reliance

thereupon.

167.    Defendants working together knowingly concealed, suppressed, or omitted

facts material to the transactions at issue, in that BTC never owned or operated any Bitcoin

mining operations or were otherwise involved in nefarious and illegal dealings and each co-defendant aided BTC in concealing its nefarious and illegal plan from the general public.

168.    As a proximate cause of the conduct aforesaid actions, AA suffered and continues to suffer economic damages.

169.    BTC's false advertising and operation of the Ponzi scheme caused a complete collapse of AA's Bitcoin trading business and losses of AA's anticipated return of Two Million Two Hundred Four Thousand Seven Hundred Sixty Five ($2,204,765.00) Dollars plus repayment of its principal in the amount of Seven Hundred Seventy Five Thousand Nine Hundred Dollars ($774,900.90) and Ninety Cents.

170.    As a result of this loss, AA was also unable to purchase subsequent mining contracts for the 2016-2017 contract year.  AA's reinvestment of the 125 new Bitcoin that BTC would have, but failed to generate, had it been a legitimate Bitcoin mining operation should have performed at a multiple of 2.8125 x the initial investment and yielded a return of 351.56 Bitcoin or an additional Six Million Two Hundred Thousand Nine Hundred One ($6,200,901.56) Dollars and Fifty-Six Cents.

## Seventh Count

## Negligence

171.    Each of the defendants besides BTC failed to exercise under the circumstances with the requisite duty of care which a person of ordinary prudence would exercise under similar circumstances.

31

172.    Each of the defendants both performed acts, which the ordinary prudent person in their respective positions would not have done, or otherwise failed to do that which the ordinary prudent person would have done, under the circumstances then existing.

173.    Ordinary parties in the defendants respective positions, under similar circumstances and by the use of ordinary care, would have foreseen the results – namely that their services would be abused for malicious, illicit and illegal purposes.

174.    Ordinary parties in the defendants respective positions, either would not have acted or, if they did act, would have taken precaution to avoid the result.

175.    The general customs of the defendants' respective industries are evidential as to what is the reasonable standard in such industry, and establishes the care each respective defendant was required to exercise in the performance of its operations.

176.    Lenta, as an owner/operator of business centers owes a duty of reasonable care to patrons of its tenants to provide a reasonably safe place to conduct business.

177.    It is a duty to take steps that are reasonable and prudent under all the circumstances for a patrons' safety.

178.    The duty owed requires the owner/operator of a business center to exercise ordinary care to protect patrons from potential injury inflicted by individuals that the owner/operator could have reasonably foreseen might be present on the premises.

179.    Lenta's practices and policies of failing to verify customers' legitimacy and authenticate their information makes criminal activity on the premises reasonably foreseeable, and Lenta had a duty to take reasonable steps to protect AA from that danger.

180.    Each of the defendants created a direct relationship with AA by providing background information on the services it provided and its business relationships with BTC that AA relied upon prior to purchasing Bitcoin mining contracts from BTC.

181.    As a result each defendant owed a duty to AA.

182.    Alternatively, it was foreseeable by undertaking defendants' respective, careless business practices that a plaintiff in AA's position would be similarly injured by parties like BTC that took advantage of the other defendants' intentional policies to provide services to the  online fraud market by concealing and fail to verify customer information associated with criminal schemes.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff hereby prays that this Court, entering judgment for Plaintiff on all counts of this Complaint against all defendants jointly and severally for all available remedies at law or in equity including *inter alia*:

a.      Judgment in the amount of Nine Million One Hundred Eighty Thousand Five Hundred Sixty Seven ($9,180,567.46) Dollars an Fourty Six Cents, comprised of:

i.      Seven Hundred Seventy Five Thousand Nine Hundred Dollars ($774,900.90) and Ninety Cents in favor of AA for return of the principal invested by AA;

33

      ii.      Judgment in the amount of Two Million Two Hundred Four Thousand Seven Hundred Sixty Five ($2,204,765.00) Dollars in favor of AA for lost profits as a result of BTC and the other defendants' conduct;

      iii.      Judgment in the amount of Six Million Two Hundred Thousand Nine Hundred One ($6,200,901.56) Dollars and Fifty-Six Cents in favor of AA for additional lost profits as a result of BTC and the other defendants' conduct;

b.      Awarding Plaintiff damages in an amount to be proven at trial pursuant to *N.J.S.A.* § 56:4–1; and

c.      Awarding Plaintiffs the costs of this suit, including the expenses of discovery and document production, and its reasonable attorneys' fees; and

d.      Awarding such other and further relief as the Court deems just and proper.


**THE AGRESTA FIRM**,
*Attorneys for Plaintiffs*

BY:    *s/Robert A. Agresta, Esq.*
        Robert A. Agresta, Esq.

Dated: December 7, 2017


**DESIGNATION OF TRIAL COUNSEL**

Robert A. Agresta, Esq., is hereby designated as trial counsel for the plaintiffs in the above-captioned matter.

34

**THE AGRESTA FIRM**,
*Attorneys for Plaintiffs,*

By:   <u>s/Robert A. Agresta</u>
Robert A. Agresta, Esq.

Dated: December 7, 2017

## <u>JURY DEMAND</u>

Plaintiffs request a trial by jury on all of the issues so triable in this matter.

**THE AGRESTA FIRM**,
*Attorneys for Plaintiffs,*

By:   <u>s/ Robert A. Agresta</u>
Robert A. Agresta, Esq.

Dated: December 7, 2017